ORIGINAL

FILED IN OPEN COURT
U.S.D.C. - Atlanta

SEP 26 2019

JAMES N. HATTEN, Cler
By: _____ Deputy

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

UNITED STATES OF AMERICA

$v.$

AVANIR PHARMACEUTICALS,
INC.

Criminal Information

No. 1:19-CR-00369

THE UNITED STATES ATTORNEY CHARGES THAT:

At various times relevant to this Information:

**Avanir Pharmaceuticals, Inc.**

1. The defendant, AVANIR PHARMACEUTICALS, INC., was a pharmaceutical company formed under the laws of the state of Delaware, with its principal executive offices at 30 Enterprise, Suite 400, Aliso Viejo, California 92656. It had approximately 500 employees. In January 2015, AVANIR was acquired by Otsuka Holdings Co., Ltd. through its wholly-owned subsidiary, Otsuka Pharmaceutical Co., Ltd.

2. Nuedexta was AVANIR's primary marketed product.

3. The FDA approved Nuedexta for the treatment of pseudobulbar affect ("PBA") in October 2010, and AVANIR commercially launched the drug in February 2011. Nuedexta is a drug created by combining two generic drugs, Dextromethorphan and Quinidine. AVANIR has patent exclusivity for the drug until 2026.

4. Nuedexta obtained FDA approval for a single indicated use – the treatment of PBA – in October 2010.  Nuedexta's 2010 FDA-approved label referenced the limited indication:

> NUEDEXTA is . . . indicated for the treatment of pseudobulbar affect (PBA). Studies to support the effectiveness of NUEDEXTA were performed in patients with underlying amyotrophic lateral sclerosis (ALS) or multiple sclerosis (MS). NUEDEXTA has not been shown to be safe or effective in other types of emotional lability that can commonly occur, for example, in Alzheimer's disease and other dementias.

Nuedexta's FDA-approved label was modified in January 2015, as follows:

> NUEDEXTA is a combination product containing dextromethorphan hydrobromide (an uncompetitive NMDA receptor antagonist and sigma-1 agonist) and quinidine sulfate (a CYP450 2D6 inhibitor) indicated for the treatment of pseudobulbar affect (PBA).

5. PBA is a neurological condition that is characterized by sudden and frequent episodes of involuntary laughing or crying that do not reflect the patient's actual emotional state.  PBA does not exist independently, but occurs secondary to an underlying neurological disorder or injury, such as ALS, MS, Alzheimer's disease, stroke, and traumatic brain injury, as reflected in the FDA-approved label.  PBA has a low level of prevalence among the general population.

2

6. Executive 1 was at various times Vice President, Sales & Managed Markets, Senior Vice President, Sales, Marketing & Managed Markets, and Senior Vice President, Commercial.

7. Executive 2 was at various times Senior Regional Business Manager, East Area Director, National Sales Director, Neuroscience, Senior Director, Specialty Sales, and Executive Director, National Sales.

8. Executive 3 was at various times Chief Commercial Officer, Chief Operating Officer and Executive Vice-President, and CEO & President.

9. Executive 4 was Vice President, Marketing.

10. Employee 1 was a Neuroscience Area Manager in the Ohio Valley.

11. Employee 2 was at various times Neuroscience Area Manager and Regional Business Manager.

12. Employee 3 was at various times Neuroscience Area Manager and Marketing Product Manager

13. Employee 4 was Regional Business Manager.

14. Employee 5 was at various times Regional Business Manager and an Area Sales Director.

15. Employee 6 was a Senior Neuroscience Area Manager.

16. Employee 7 was a Neuroscience Area Manager.

17. Employee 8 was an Area Sales Director.

18. Employee 9 was a Senior Director, Marketing.

19. Dr. A was a neurologist in Northern Ohio.

## Medicare

20. The Medicare Program ("Medicare") was a federal program that provided free or below-cost health care benefits to certain individuals, primarily the elderly, blind, and disabled.  Individuals who received benefits under Medicare were commonly-referred to as "beneficiaries."

21. Medicare was a federally funded and administered health insurance program primarily for elderly and disabled persons.  The Centers for Medicare and Medicaid Services ("CMS") was a federal agency within the United States Department of Health and Human Services responsible for administering the Medicare and Medicaid programs.

22. The Medicare system contained four components programs:  Parts A, B, C, and D. Medicare primarily covers prescription drugs under Parts A, B, and D, and Nuedexta is covered under Parts A and D.

23. Medicare Part A covered drugs administered to beneficiaries during inpatient hospital stays and the first 100 days of care at skilled nursing facilities following qualifying hospital discharges.

24. Medicare Part D provided optional prescription drug benefit coverage to all Medicare beneficiaries.  CMS contracted with private health insurance companies to provide drug coverage to beneficiaries who enrolled in Part D prescription drug plans.

4

25. Since Medicare Part D became effective in January 2006, it has covered most outpatient prescription drugs for Medicare beneficiaries and dual-eligible beneficiaries (persons eligible for both Medicare and Medicaid coverage).

26. Medicare beneficiaries had access to Part D prescription drug coverage offered by private plans, either as a stand-alone prescription drug plan or as part of a managed care plan.

### Medicaid

27. The Medicaid Program ("Medicaid") was a jointly funded, federal-state health insurance program that provided certain health benefits to the disabled, as well as to individuals and families with low incomes and resources. The federal government provided matching funds to Medicaid and ensured that states complied with minimum standards in the administration of the program.

28. Medicaid was a joint federal/state program that paid for health care services for a variety of low-income individuals.

29. Medicaid offered federal matching funds to states that establish Medicaid plans providing certain low-income populations with access to health care. While the entire Medicaid system was overseen by the Secretary of the United States Department of Health and Human Services and CMS, separate Medicaid agencies and directors administer the programs within each state. The state Medicaid programs were jointly financed by the federal and state governments.

30. While the Medicaid Act did not require state Medicaid programs to cover outpatient prescription drugs, every state elected to do so.

31. Medicare and Medicaid were each a "Federal health care program" as defined in Title 42, United States Code, Section 1320a-7b(f).

### The Kickback Scheme

32. From at least as early as in or about November 2011, until in or about February 2016, in the Northern District of Georgia and elsewhere, the defendant, AVANIR PHARMACEUTICALS, INC., did knowingly and willfully offer and pay, and cause to be offered and paid, remuneration, directly and indirectly, overtly and covertly, in cash and in kind, that is, kickbacks, from AVANIR to Dr. A, to induce Dr. A to refer individuals, including Medicare and Medicaid patients, to pharmacies for the furnishing of the drug Nuedexta, for which payment was made, in whole and in part under a Federal health care program, namely, Medicare and Medicaid.

33. The purpose of the scheme was to induce Dr. A to become a high prescriber of Nuedexta to beneficiaries of federal healthcare programs, to offer financial incentives to Dr. A to write additional Nuedexta prescriptions for beneficiaries of federal healthcare programs, and to induce Dr. A to recommend that other physicians prescribe Nuedexta to beneficiaries of federal health care programs.

6

34. In connection with the kickback scheme, AVANIR paid Dr. A more than $330,000 in speaker fees and honoraria from in or about November 2011 through in or about February 2016. According to AVANIR's records, Dr. A was the highest prescribing doctor for Nuedexta in the country in total during this period, writing thousands of prescriptions, resulting in over $5 million being paid by Medicare and Medicaid for those prescriptions.

35. As part of the scheme, executives and other employees at AVANIR agreed to use payments to Dr. A, including speaker fees and honoraria, to induce him to maintain and increase his prescription volume.

36. In February 2012, a Neuroscience Area Sales Representative wrote to the wife of a doctor: "I have a way for [the doctor] to make 2500 bucks identify 5 patients from a home that have alzimers or demtia."

37. Sales executives at AVANIR intended for speaker fees to be used to induce prescribers to increase prescriptions of Nuedexta. For example, in June 2012, Executive 2, the then East Area Director, wrote an email to sales employees, including one in the Northern District of Georgia, saying:

> I want to give $4K in program money to you 2 help you move both of you even further up the ranking☺
> My initial thought is that you have to feed the F[] machine with it, but I know you have to discuss it first. Can the two of you talk today and come up with a great way to use this money to get the most return?

38. Employee 3 emailed Employee 2 regarding Dr. A and stated that Dr. A's "script volume has declined" and that a "[s]trategy moving forward is to continue high call frequency, continue speaker program activity, and focus him on a goal of 50 scripts/week" which was a 25% increase from his current activity.

39. In or about December 2013, a regional business manager emailed Executive 1 and Executive 2. In response to that email, Executive 2 stated that the sales representative who worked with Dr. A was "projected to finish the quarter with negative growth." In order to address that, the regional business manager said "the best way to improve [his] performance would be to increase the scripts from [Dr. A]." The regional business manager said one method of increasing the scripts was to "Ave [sic] 1 to 2 educational programs per week" for which Dr. A would be paid.

40. In May 2014, a sales manager wrote an email to his sales team saying, "I would like to discuss your individual speakers and how you plan to grow their business during our Monday one-on-one calls." Executive 2, then the National Sales Director, Neuroscience, responded "Great email."

41. A 2014 regional business review specifically tracked speakers' prescription increases to monitor speaker accountability.

42. In January 2015, AVANIR continued to focus on Dr. A, calling him a "Hyper Focus Target[]" and sought to increase his prescription level. A strategy to accomplish this included continued educational programs occurring one or two times each week for which Dr. A would be paid.

8

43. In April 2015, Executive 1 texted an employee about buying alcohol to provide to Dr. A:

Executive 1: If you have room, would you pick up 2 henessey white liquor at the airport? I want to give to customers and maxed out. Should be about $40 per bottle.

44. Also in April 2015, Executive 1 texted with Executive 4 about changes in the payment for AVANIR speakers and how that would adversely impact the company's sales goals:

Executive 1: Are you ok to discuss speakers and next steps?
Executive 4: Yes, I don't have slides. But I thought I could give an update on recontracting/Fmv fee structure. And plans/timing for live speaker training. And most importantly it's an opportunity to listen to their concerns.
Executive 1: Ok
Executive 4: How did it go with N[] earlier?
Executive 4: . . . . we can circle back later on the topic of the speakers bureau... Also, I'm spending a couple of hours later today with J[] and N[] to go through all the issues that have surfaced over the past few weeks with the speakers bureau to brainstorm solutions and prevent repeat occurrences.
Executive 1: We have a firestorm with the speakers bureau. If you add the number of speakers who are no longer going to speak and their contribution to our number this year, we will be hard pressed to achieve our goals. I'm beyond unhappy about this. By the way, [Dr. A] just opted out. His words to D[] were "I'm done with you guys."
Executive 1: I didn't dare tell Dr P[] that he was gone when I saw him this week. 15 homes he now has.
Executive 1: His last text to me just so you're in the loop....It would be pointless to meet at this time !!! My trust and confidence is down to zero !!! Thank you for your time !!!#

9

Executive 4: [Executive 1], I know this has been a rough process. I for one underestimated how some doctors would react to the new fee structure, even when their total compensation under the new contract would not go down. And I certainly didn't expect that a handful of doctors wold have to be removed from the bureau based on their background checks. N[] and I (and J[]) are working to fix the issues with HealthStar (service and technology) and improve the communication around re-contracting and notifying those that are not being offered new contracts. We spent two hours on this today. Call my cell if you'd like to discuss, otherwise we can address this in person in the office next week. . . .

Executive 1: Feel that sales has been removed from the process and we are holding the bag to either clean it up with our customers or manage the wrath and lost sales due to co. Decisions.

Executive 1: I'm not blaming but am spending incredible time managing a ton of upset customers and our team members who are dealing with it. And it's not good enough to say to a customer, call N[]. They, like you and I, consider this a blow off. Then, when we ask them for help or access, they respond in like fashion.

Executive 4: If you want, on Monday, I can personally call every single speaker that we are not extending a new contract to and every speaker that is unhappy with our fee structure and let them vent. Reps and managers are taking the heat. I'm willing to jump in for them. In the end there will still be some bruised egos. But we will get past all this, I assure you.

Executive 1: Thanks, but I'm really more interested in finding ways to say yes to some if our current no's vs. having you listen to customers vent. Sales still has to deal with them and still has to find to business that offsets their current volume when they become less enthused about our co.

45. Later that same day, Executive 3 and Executive 1 texted concerning sales' role in managing the speaker program and the negative impact on "big writers" of prescriptions if they are no longer paid through the program:

10

Executive 3: Just noticed that K[] was on all those texts - lets keep him off (else there will be another twenty questions). In hindsight we should have moved J[] only after this was all sorted. He and K[] were the drivers here and while N[] is doing a nice job, he inherited something from J[] that he is trying to fix. Think K[] and J[] thought Healthstar was great but maybe not so... Let all meet next week and try and fix collectively.....

Executive 1: Just very frustrating for the team to see something rolled out differently than presented and feel that the full team doesn't get the impact of these types of decisions.

Executive 1: I can manage, but the team is distracted by this and is forced to manage as the face of the co to the customer.

Executive 3: Fair point and I hear their frustration. Anything I can do to help?

Executive 1: Next steps lie with E[], N[] to determine what they feel they can do with the feedback. FYI...there will be repercussions for these big writers that we don't renew. I hear it's one doc or two but everyone listed accounts for significant amount of biz.

Executive 1: You can help to ensure that I have a seat at the table to know what is going on vs marketing, medical, compliance making big decisions that sink our ability to achieve goal and leaving sales holding the bag.

Executive 1: I think D[] has talked him off the ledge. I may have to go to Cleveland Monday to meet with him.

Executive 3: Were you and E[] able to connect today. Spoke with him about the speaker issues - clearly roll out did not go well. I just reviewed the paperwork on folks being recommended for removal - some pretty bad stuff, some addressable. Think in the end there are 5-6. Lets talk live on it. Believe they are meeting again Monday and suggested you should be in the mtg. Do you need to go calm [Dr. A] next week.

46. In December 2015, Employee 1 emailed AVANIR's vendor who handled scheduling and paying speakers. He stated that Dr. A was near the cap for 2015, but that he needed to be added as a speaker multiple times in 2016 and for each speaker program there should be:

11

No minimum guests.
No food and beverage minimum.
No pre-set menu (ability to order off the menu)
No A/V equipment

47. Also in December 2015, Employee 2 and Employee 1 texted regarding scheduling speaker programs for Dr. A in 2016 in order to keep him prescribing at the levels he did in 2015:

Employee 1:  I've loaded a bunch of programs from Jan –May . . . . Would u recommend me loading more Nuedexta programs into late May, June....
Employee 2:  I would say loading them through May is good!!!  Let's see if our attempt to "force the hands" of those who make our budgets works! Proactively loading these programs is a risk that I (and I am certain you) are willing to take. Best case is that we receive 2015 funding for these programs. Worst case is that they wipe them clean and ask us to judiciously re-enter the programs, within the 2016 budget. Again, this proactive measure of pressing on is the right call. Maybe by doing so, we receive funds that never would have been granted. Time will tell. Now, we wait. Let's see what (if anything) is said.
Employee 1:  Cool. I'll lock and load a few more through the end of mail. And of course there will be the [Dr. A]-add on effect which happens a few times each and every month too. Thanks for the expeditious response.
Employee 2:  It does not look as though we are going to be able to use any of the 2015 funds for 2016.  Even more alarming, in AvanirEvents, I see my Regional budget for 2016 set at $50K.  I am going to send [Employee 5] a text, to see what we can do. If the budget is set at $50K for our entire region, you will have to cancel at least half of the programs submitted. This is part of the reason why I just wanted to schedule programs for January, to test the waters. I will keep you posted.
Employee 2:  I sent a thorough text to [Employee 5]...will keep you posted. We will push it.

Employee 1:  I saw that. I was actually going to text u bc I ran out of funds. Thx [Employee 2]. I definitely appreciate that! I would hate to derail our freight train. I think it's imperative for ur #s and mine too that we keep things moving in a northerly direction.

Employee 2:  I agree and will continue to work at securing additional funds. . . .

48. On Christmas Eve, Employee 2 texted Employee 5 regarding his concerns about the lack of funding to pay doctors, including Dr. A, for speaker programs. He directly linked the need for an increased speaker program budget to avoiding a decrease in sales in 2016:

Employee 2:  Please excuse the Christmas Eve text. I see in AvanirEvents.com that my 2016 speaker program budget is $50K. This won't even cover Dr. A, let alone give anyone else an opportunity to schedule a program on my team. This was an issue last year as well, at the beginning of the year. This region simply needs more funds. The consequences are dire.  Is my budget actually $50K for 2016? If so, what can we do to secure additional funds? Having experienced the perils of a small budget early on last year, I am certain that we will have an issue on our hands to begin this year as well.  Thanks for looking into this [Employee 5]. I do not want our 2016 sabotaged right out of the gate!

Employee 5:  I think that is just an initial deposit. We are going over to a new vendor in 2016. I haven't received our budget yet

Employee 2:  Very well. Thanks.  Budget allocation was handled poorly last year. All regions were allotted the same amount. Very poor. There is no getting around the "special circumstance" that exists in my Region. One that was created long ago, during launch. It decimated my year in 2015. It stands to do the same for both of us in 2016. I begged, bartered, and borrowed funds early last year in an attempt to mitigate the significant loss. It was a silly exercise to endure. This year, I would like proper allocation, based on business demands and our top priority of hitting 200M in sales!  Thank you, [Employee 5].

13

Employee 5:  We will have more flexibility this year to allocate
Employee 2:  Excellent. Thank you, [Employee 5].

49. In January, 2016, Employee 2 and Employee 1 continued their discussion about the importance of speaker program funding:

Employee 1:  . . . . On a side note, any updates with respect to 2016 program funding? I would love to keep the machine well oiled but I need more oil;)
Employee 2:  No word from [Employee 5]. I made it very clear to him though, that funding for us needs to be his TOP priority.
Employee 1:  Cool. Thk u. Hopefully u can squeeze some more out of him.
Employee 2:  He will give us the majority of his funds. More importantly, he needs to lobby for more funds than the other two directors are set to receive. He knows that the consequences are dire. Time for [Employee 5] to get it done.
Employee 1:  Nice. Yeah, I totally agree [Employee 2]. He needs to deliver!
Employee 2:  I have helped him significantly, with a few things of critical importance. I do believe that we have earned some special consideration.

50. On January 7, 2016, Employee 1 texted Employee 2 about Dr. A:

Employee 1:  A fwd from [Dr. A]. He's hungry, believes in what we are doing and is committed to operation "Shock and Awe." Time to feed the beast [Employee 2].

51. The next day, Employee 1 and Employee 2 continued their conversation via text:

14

Employee 1: Talked to [Dr. A]. No shockers. He felt his numbers would be down both weeks bc he worked half days the respective Thursdays and didn't work either Friday...it coincides perfectly with what he was down. He was shocked at [Employee 5]'s numbers. Was wondering if Avanir missed any? He also wanted to stress the importance of continuing programs (in-office and venue based) to me and u . Definitely didn't see that one coming. :) Haha. I told him I agreed and u were working diligently to secure funds...wasn't a matter of if, just when.
Employee 2: Thanks for the Intel. Is agree, all topics that you provided updates for are both logical and predictable. Also, tell [Dr. A] that we as in the middle of transitioning out of HealthSTAR and into a new vendor. I mentioned this to him on the phone this past Tuesday, but you might want to reiterate it. That also has something to do with the delay. Thankfully, we were given some funds to get programs on the books at all...couldn't imagine if you were unable to enter all of those programs for Jan/Feb/March already. We will have details soon! And we WILL get it done!

52. Several days later, Employee 1 asked if there were any more information on funding for Dr. A because he has been asking for more:

Employee 1: Any news on funding? [Dr. A] has been asking about more programs. [Employee 5] got back to me and [Dr. A] today and let us know The healthstar issue has been resolved(i had been using that to bide our time). Can hold him off a little longer, but we're going to need some funding soon [Employee 2].

Employee 2: Keep holding him off and remind him how I was able to get the funds flowing last year. He needs to constantly be reminded that you and I made it happen. Do not let him forget that I proactively secured funds all year, making 2015 the most high volume year of programs in Cleveland and the surrounding areas, since launch. . . . Because I do not see him each week, please always look for opportunities to remind him how hard I work for him, behind the scenes. His knowing this will help you, I guarantee. If he is aware and confident that things are in motion at a higher level, he responds well. He has a short memory and thus needs a constant reminder. Especially regarding all of the things that I do for him. I say all of this from experience last year. [Employee 5] expects to have a budget update by next week. Also, D[] and [Employee 5] are flying to Cleveland next Thursday to meet with him. I am working on setting a Greenlight meeting up for him, with K[].

Employee 1: Will do [Employee 2]! I believe he feels a sense of entitlement due to his last two months of performance. He's called me two days in the row, reminding me how important programs are, how imperative it is to continue the momentum, etc. What concerns me is what happened last year, first quarter with B[] when there was a disruption of funding. Hopefully history will not repeat itself. I will do all I can to contain the situation. He's only looking for a few in-office programs. If there's any $ u come across before u hear from [Employee 5], let me know and I will put out the fire by scheduling him three in-office prgms. We can tackle the other prgms later.

* * *

Employee 2: Amen, brother, on all counts. Trust me, I share in your concern, regarding how last year started off. It ruined my year. I was texting with [Employee 5] last night at 10:30 about funding. He and I have grown quite close and I do believe that he is going to hook us up with the appropriate funding. I also know that [Dr. A] is relentless and holding him off is not easy. When I say that my 2016 budget is THE top priority, I mean it, as evidenced by my late night texting with [Employee 5]. The cool thing about [Employee 5] is that he gets it. When [Dr. A] and I spoke last Tuesday, I told him that my goal was to get K[] to the dinner this Thursday (before or after) so that he could speak with [Dr. A] AND the other docs in attendance. You and I are on the same page.

16

53. At the same time, Employee 2 was texting with Employee 5 about securing the payments for Dr. A:

Employee 2:  I will and thank you.  Dr. A. is pressing [Employee 1] hard for more programs, inquiring about our 2016 budget multiple times per week. We have expressed to him that our 2016 budget has not been granted quite yet. We have also informed him that Avanir is transitioning to a new vendor. Both of these have bought us some time with Dr. A. [Employee 1] and I plan tactically for Dr. A. weekly, especially during times like these, when an open budget is not available.
Employee 5:  Hopefully the new budget will be available soon. I will plan accordingly
Employee 2:  Excellent, [Employee 5]. It will serve all parties well. [Employee 1] and I thank you for that support.

54. Employee 2 and Employee 1 texted about "funny money" in an effort to find funds to pay Dr. A:

Employee 2:  Thanks [Employee 1]. I appreciate that initiative.  Also, I asked [Employee 5] to look into whether he is able to "re-allocate the funny money" in HealthSTAR to our Region from another, until the 2016 funds are releases. He said that he would "look into it."  I of course, will stay all over this.
Employee 1:  Great. Thx a lot F[]...appreciate it! Have a great weekend.
Employee 2:  [Employee 1], there might be "funny money" HealthSTAR funds available. When time permits, it is worth checking out. [Employee 5] told me that he started to look into the prospects of moving the "fake funds" around. If they are there, fire away on those 4-5 in-office programs that we had discussed last night!  If funds are not there, know that I will continue to address this issue.  Have an awesome weekend!!!

17

Employee 1:  Just did. Looks legit. :) I will draft 4 programs and contact B[]/B[] about adding Dr. A as the speaker. Thanks a lot for the back-support. Appreciate it!

Employee 2:  EXCELLENT!  We will effectively be delivering early in the year, just as [Dr. A] had suggested.  I had a strong feeling that [Employee 5] would respond. As mentioned, he is looking for ways to do something for our Region.  A successful Greenlight discussion, followed by this behind the signs securing of funds, sets us up for a massive start to an epic year!

Employee 1:  Exactly! I emailed him that u came through. :) I totally agree. Thx for the persistence.

Employee 2:  Excellent! Way to sell it!  Continue to sell it hard...we came through and always will. Q1 is loaded.

Employee 1:  Absolutely. I'm going to feed him handsomely. Thx brother

Employee 2:  You got it. I will feel better once B[] gets it worked out on his end and the programs are active. Either way, this is good news for us. We are  spending heavily early on. Both you and I should  set our course to finish #1 overall in 2016.

Employee 1:  I agree on both accounts. Looking forward to a monstrous run(y)
* * *

Employee 2:  . . . . Also, as you recall, D[] introduced [Employee 5] as a project manager from the 825 team, or something along those lines. So, when reminding [Dr. A] about all the many ways that we come through for him, leave [Employee 5]'s name out entirely. Just keep the focus on you and I. [Employee 5] came through on granting my request for funds, but [Dr. A] just needs to know that I made it happen by getting approval from leadership, etc.  Have an awesome day!

Employee 1:  Great thx. Yeah, I emailed him on Friday but never heard anything back. Yes, I remembered. Absolutely. I told [Dr. A] on Friday that u came through for his first qrt funds request. Thx F[]...u too.

Employee 2:  I figured that you had remembered about [Employee 5]. Concealing [Employee 5]'s real position was D[]'s idea. Keep me posted on [Dr. A]'s response. It might be somewhat tempered, considering the issue with HealthSTAR still remains. Regardless, we got it done!!!

18

55. In February 2016, Employee 2 texted Dr. A to discuss 2016 performance and speaker payments:

Employee 2: Good morning [Dr. A]! Catching up with you on Friday afternoon was fantastic! We have an unstoppable team in place. If we have a strong finish to Q1, we will be back on track for 2016 PCLUB contention!!! Let's crush L[], A[], O[], H[] and all of the other territories in 2016! Cleveland WILL be #1!!! I am confident in that!!! We have 20 programs scheduled for Q1, compared to 6 last year in Q1. The plan is in place...now we just need a thunderous performance in February and March to get back into the PCLUB game!!! I will explain ranking methodology tomorrow afternoon. It is ALL about quarter rank, for all four quarters of the calendar year. I look forward to seeing you tomorrow afternoon, sir. Enjoy your day!

56. A week later, Employee 1 confirmed that Dr. A agreed to continue prescribing and that in return, Employee 1 added speakers programs, with their commensurate fees:

Employee 2: From Dr. A.: "Hi [Employee 2] It was great talking to you !!! Thanks for working on all the well "deserving " options for [Employee 1] !!! He is one very happy guy who always works with his heart !!! I enjoy working with him and recognizing his good relentless efforts makes me feel I am working with the best family of the "greatest people" under one banner called "Avanir" !!! Kudos to the family !!! DR"
Employee 1: Wow! Great msg! I believe he's in:D
Employee 2: Same here! Now, we crush 2016.
Employee 2; How is [Dr. A] today? Is he fired up and ready to go berserk for us in February and March?
Employee 1: Don't know. Haven't seen/spoken to him. I'll see him in an hour or two.
Employee 1: He's fired up and committed. He said he will rx 20 per day from now until the end of the month.

19

Employee 1:  He's hungry so I'm accommodating an add' prgm for weds and I will sprinkle in a few others. It is a calculated risk, but one worth taking...bet big...win big!!!
Employee 2:  Agreed. I trust your judgment. This is why I am always on the hunt, to pillage funds from other regions.
Employee 2:  20 per day....dude.
Employee 2:  THAT is what we need. THAT will deliver the quarter!!!  I can't wait to get back up there with you guys!
Employee 1:  Me too. Even if we have fallout from him, we should be able to right the ship and get things on track. He said he will track his RXs each day! Great news! He's in and all in
Employee 2:  That is perfect. Last week, in its entirety, was mission critical. Your daily pull through and progress check with him will be the difference maker now. Great work, [Employee 1]. We are back on track, with Q1.
Employee 1:  I agree. Thx for the support {Employee 2]. We'll right our ship.

**As Part of the Scheme, Avanir Sales Management Sought to Avoid Scrutiny**

57. Members of AVANIR's sales and marketing management sought to conceal communications from detection, including detection by AVANIR's compliance department.

58. WhatsApp is a messaging service that provides end-to-end encryption and user anonymity.

59. KIK is a messaging app also provides encryption and anonymity to its users.

60. Certain AVANIR sales and marketing executives and employees believed these applications provided greater anonymity and used these applications to

20

avoid detection of their communications regarding sales and marketing related to Nuedexta.

61. For example, in August 2014, Executive 1 and Executive 2 texted each other via WhatsApp:

Executive 1: [Executive 2], make sure to delete your text messages periodically. Tell your managers to do the same.
Executive 2: He said they expect around 1st week of sep, and ok on texts
Executive 2: Are texts not discoverable if deleted?

62. In September 2014, an Area Sales Director told an area manager via text, "Be careful what you put in writing."

63. A similar message was sent in April 2015, in a text conversation between Employee 6 and Employee 7:

Employee 7: . . . . He responds to Emails.
Employee 6: Just be careful what you put in it.

64. In June 2015, Executive 1 initiated a WhatsApp group conversation:

Executive 1: Recommend KIK or what's app for all manager conversations. Likely that compliance will start monitoring and auditing email in near future.
Employee 8: iMessages are also undiscoverable FYI.

65. In September 2015, Employee 7 wrote Employee 6:

Thank you for the email. I don't need notes and would prefer you do not send in the future. Please think about everything you email. Thanks

66. Later in September, Executive 3 wrote a group text message to a sales employee saying: "M[], moving forward pls no emails on this topic. Thanks"

67. In early January 2016, Executive 1 wrote to Executive 2 a WhatsApp message saying:

> Pls download KIK. We will start using instead of What's app. Since the directors are using what's app with their teams, would like to migrate to different user interface for director discussion.

68. In January 2016, a National Account Manager wrote a text message to Employee 2 saying:

> I haven't heard from S[, a compliance contractor,] yet. Obviously I know what I can & can't say when he is around but any advice.

69. Also in January 2016, Employee 9 and Executive 1 were discussing speaker payments, when Executive 1 told Employee 9 to move the conversation to KIK:

> Employee 9: Posting is up for speaker bureau. I've got a great candidate if [Employee 5] isn't interested
> Executive 1: Cool.
> Employee 9: Just saw D[]'s response. I'll get you a timeline before next Friday. It does not take a week
> Executive 1: I can wait a week, so no rush.
> Employee 9: Ok but I'll get it. It's control. She just wants time to massage it.
> Executive 1: I get it. Ok for you to press her.
> Executive 1: It is so irritating.
> Employee 9: But entertaining!

22

Employee 9:  Awesomeness. Ask me about it
Executive 1:  KIK it

70. Employee 2 and Employee 4 were discussing Dr. A in February 2016, and commented that it was good that legal and compliance were not at Dr. A's presentation:

Employee 4:  M[] just text me that [Dr. A] crushed it for her. Did an amazing job
Employee 2:  Thanks for sharing that, [Employee 4].
Employee 4:  Thankfully no legal or compliance
Employee 4:  Lol

All in violation of Title 42, United States Code, Section 1320a-7b(b)(2)(B), and Title 18, United States Code, Section 2.

### Forfeiture

71.    Upon conviction of the offense alleged in the Information, the defendant, AVANIR PHARMACEUTICALS, INC., shall forfeit to the United States, pursuant to Title 18, United States Code, Section 982(a)(7), all property, real or personal, constituting or derived, directly or indirectly, from gross proceeds traceable to the Federal health care offense, including, but not limited to: a money judgment equal to the amount of gross proceeds obtained from the offense.

72.    If, as a result of any act or omission of the Defendant, any property subject to forfeiture:

23

a. cannot be located upon the exercise of due diligence;

b. has been transferred or sold to, or deposited with, a third party;

c. has been placed beyond the jurisdiction of the Court;

d. has been substantially diminished in value; or

e. has been commingled with other property which cannot be divided without difficulty,

the United States of America shall be entitled to forfeiture of substitute property pursuant to Title 21, United States Code, Section 853(p), as incorporated by Title 18, United States Code, Sections 982(b), and Title 28, United States Code, Section 2461.

BYUNG J. PAK
  United States Attorney


CHRISTOPHER J. HUBER
  *Assistant United States Attorney*
Georgia Bar No. 545627

600 U.S. Courthouse
75 Ted Turner Drive SW
Atlanta, GA 30303
404-581-6000; Fax: 404-581-6181

24